**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

**v.**                                                 **Case No.: 3:08cr79/MCR**

**CLAUDIA CONSTANCE HIRMER,**
**MARK STEVEN HIRMER,**
**EUGENE JOSEPH CASTERNOVIA,**
**ROBERT LEIGHTON PENDELL,**
**ARNOLD RAY MANANSALA,**
**DOVER EUGENE PERRY,**
**MICHAEL GUY LEONARD,**
**MARK DANIEL LEITNER, and**
**ARTHUR RAMIREZ MERINO,**

      **Defendants.**

_____/

## MEMORANDUM OPINION

      On August 21, 2008, a federal grand jury returned a fifteen-count Indictment against Claudia Constance Hirmer, Mark Steven Hirmer, Eugene Joseph Casternovia a/k/a "Gino," Robert Leighton Pendell, Mark Barry Lyon, Ellen Meredith Stubenhaus a/k/a "Dr. Ellen,"[1] Joseph William McPhillips, Arnold Ray Manansala, Dover Eugene Perry, Michael Guy Leonard, Mark Daniel Leitner, Arthur Ramirez Merino, and Jeffrey Jean Jenks based on their involvement in a scheme to fraudulently promote and sell various tax- and debt-elimination products through a company known as PQI. Specifically, in Count One, all defendants except for Jenks, were charged with conspiracy to defraud the United States and commit wire fraud in violation of 18 U.S.C. § 371. Count Two charged all defendants with conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(I) and

---

[1] Stubenhaus is currently in San Jose, Costa Rica, pending extradition to the United States and has not appeared before this court.

(h).   Count Three charged Claudia Hirmer and Mark Hirmer only with tax evasion in violation of 26 U.S.C. §§ 7201 and 7203.  The remaining counts of the indictment charged wire fraud in violation of 18 U.S.C. § 1343, but were later dismissed against all defendants except Stubenhause.[2]   The government dismissed Count Two and the accompanying forfeiture count against Leitner, Merino, and Jenks.  Two of the defendants, Lyon and McPhillips, pleaded guilty to the charges against them.   The remaining defendants proceeded to trial on March 1, 2010.  Before the case was submitted to the jury, the court granted a judgment of acquittal in favor of Pendell on Count Two.  The jury returned a verdict on March 31, 2010, finding Claudia Hirmer and Mark Hirmer guilty on Counts One through Three; Casternovia, Manansala, Perry, and Leonard guilty on Counts One and Two; and Leitner, Merino, and Pendell guilty on Count One.[3]  Following the jury's verdict, the court granted a judgment of acquittal in favor of Pendell on Count One.  After all the defendants had been sentenced, the court held a restitution hearing on October 27, 2010, at which the government and all defendants appeared, either individually or through counsel.  At the conclusion of the hearing, the court ruled that the government was not entitled to restitution in this matter.  This Memorandum Opinion is intended to memorialize and explain the court's ruling made in open court and on the record at that hearing.

**DISCUSSION**

The following facts were established at trial.  PQI was a Panamanian business, headquartered in Ft. Walton Beach, Florida, that sold memberships to customers allowing them access to various presentations, discussions, and materials promoting anti-tax theories.   These promotional materials contained numerous false and misleading statements about the United States tax system purportedly made by attorneys and leading tax experts, which was not the case.  Depending on the level of membership purchased,

---

[2] The Indictment also contained a criminal forfeiture provision, through which the government sought to forfeit in excess of $50,000,000 in cash, several pieces of real property, and a number of bank accounts.

[3] The jury also returned a verdict of forfeiture finding that $3,600,000 in cash and two parcels of real property were involved in or traceable to property involved in the money laundering conspiracy charged in Count 2.

the cost ranged from $1,350 to over $17,000.[4]   PQI was controlled by Claudia and Mark Hirmer, who were assisted in the management and operation of the company by an Executive Council, the members of which included McPhillips, Manansala, Perry, and Leonard.[5]   PQI sold memberships through certain authorized individuals, referred to as "Qualified Consultants "("QCs").[6]  The government argued, both at trial and in its restitution memorandum, that PQI earned $14,727,150 through the sale of its memberships and membership fees.  The government further asserted that the defendants who marketed and sold PQI memberships earned income as a result of those sales.  According to the government, McPhillips, Manansala, Perry, Leonard, and Leitner[7] earned $600,712; $1,161,717; $352,359; $271,260; and $279,062, respectively.  PQI also contracted with vendors to sell products and services.  Southern Oregon Resource Center for Educational Services ("SORCE") and Financial Solutions were PQI vendors.  SORCE, which was controlled by Casternovia, sold products designed to assist customers in concealing assets through the use of offshore entities and fictitious trusts and earned $4,291,078 in sales to PQI customers.[8]  Lyon and Pendell were employees of SORCE.  Financial Solutions, which was owned and controlled by Merino, was another PQI vendor.  Financial Solutions purported to assist customers with asset protection and debt elimination and allegedly

---

[4]  There were three levels of membership in PQI: Q1, Q2, and Q3.  A Q1 membership, for which a customer paid $1,350, gave the customer access to a series of "educational" CDs.  Level Q2 and Q3 membership entitled the customer to attend offshore conferences at a cost of $7,500 and $18,750, respectively.

[5] The Executive Council, which consisted of PQI's top-selling members, assisted in the administration and operation of PQI.

[6]  Members of the EC also sold memberships.

[7]  Leitner was a Qualified Consultant.

[8]  The court ruled at the sentencing hearings (for purposes of the loss calculation) that not all of SORCE's gross receipts could be attributed to the conspiracy because SORCE did not become a PQI vendor until August 20, 2003, and some of its sales after that date were to non-PQI members and thus were not in furtherance of the charged conspiracy.  Presumably in light of that ruling, the government referred in its restitution memorandum to a spreadsheet that cross-referenced SORCE's customers with those of PQI and showed that 347 of SORCE's 490 members were PQI customers. Based on the spreadsheet, the government argued that it was reasonable to include in the restitution figure 70% of SORCE's sales after it joined the conspiracy.

earned $2,075,687 through sales to PQI customers.  The government also established through the evidence at trial that each of the defendants failed to file federal income tax returns and pay federal income tax during at least a portion of the conspiracy charged in Count One.  In support of its restitution claim, the government argued that it suffered a loss as a result of the defendants' failure to pay income tax during the course of the conspiracy. According the government, it is entitled to restitution in the amount of the income tax due on the total gross receipts of the conspiracy, which it calculated to be $22,191,297.

Under the Mandatory Victims Restitution Act of 1996 ("MVRA"), a person convicted of a crime against property, including an offense committed by fraud or deceit, must make restitution to the identifiable victims of the offense who have suffered physical or pecuniary loss.  *U.S. v. Thomas*, 271 Fed. Appx. 818, 820 (11th Cir. 2007) (citing 18 U.S.C. § 3663A(c)(1)(A)(ii), (c)(1)(B)).  "[T]he term 'victim' means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2).  The MVRA establishes procedures for identifying victims and the losses they sustained.  According to § 3664(a), the court should direct the probation officer to obtain and provide information in the form of a report from which the court can fashion a restitution order, including, to the extent practicable, a complete accounting of each victim's loss.  18 U.S.C. § 3664.  "If the number or identity of victims cannot be reasonably ascertained, or other circumstances exist that make this requirement clearly impracticable, the probation officer shall so inform the court."  *Id.*  After consulting with all identified victims, to the extent practicable, the government must provide the probation officer, upon request and not later than 60 days before the sentencing hearing, with a listing of all amounts subject to restitution.  18 U.S.C. § 3664(d)(1).  The probation officer must then provide notice to the identified victims of the offenses of which the defendant was convicted; the amounts subject to restitution; the opportunity to submit information concerning the victim's loss; the scheduled date, time, and place of the sentencing hearing; the availability of a lien in favor of the victim; and the

opportunity to file a separate affidavit relating to the amount of the victim's loss subject to restitution. 18 U.S.C. § 3664(d)(2)(A)(I)-(vi). After reviewing the probation officer's report, the court may request additional documentation or conduct a hearing. 18 U.S.C. § 3664(d)(4). If the victim's loss cannot be ascertained ten days prior to sentencing, the attorney for the government or the probation officer should so advise the court, and the court should set a date for the final determination of the victim's loss within 90 days of the sentencing. 18 U.S.C. § 3664(d)(5).

The government bears the burden of proving by a preponderance of the evidence the amount of loss incurred by each victim as a result of the defendants' criminal activity; in the event the government sustains its burden, the court is required to award restitution to each victim in the amount of the victim's loss. 18 U.S.C. § 3664(e) and (f)(1)(A). Because "'Congress intended that restitution be a compensatory remedy from the victim's perspective,'" *see U.S. v. Lange*, 592 F.3d 902, 907 (8th Cir. 2010) (quoting *U.S. v. Petruk*, 484 F.3d 1035, 1038 (8th Cir. 2007)), "[a]n award of restitution must be based on the amount of loss actually caused by the defendant's conduct." *U.S. v. Liss*, 265 F.3d 1220, 1231 (11th Cir. 2001). In other words, "restitution is limited to 'the victim's provable actual loss.'" *Lange*, 592 F.3d at 907 (quoting *United States v. Chalupnik*, 514 F.3d 748, 754 (8th Cir. 2008)). However, if the precise amount of a victim's loss cannot be determined, the court may estimate the loss as long as it has a reasonable basis upon which to do so. *See United States v. Futrell*, 209 F.3d 1286 (11th Cir. 2000). Further, if the court finds that more than one defendant contributed to a victim's loss, the court may hold each defendant jointly and severally liable for restitution or it may apportion liability among the defendants according to each defendant's proportional contribution to the victim's loss and the defendants' economic circumstances. 18 U.S.C. § 3664(h). If more than one victim sustained a loss requiring restitution, the court may order restitution to each victim based on the type and amount of the victim's loss and the victim's economic circumstances. 18 U.S.C. § 3664(I). Notably, "[i]n any case in which the United States is a victim, the court shall ensure that all other victims receive full restitution before the United States receives

any restitution."[9]  *Id.*  Restitution is not required, however, where "the number of identifiable victims is so large as to make restitution impracticable" or where "determining complex issues of fact related to the cause or amount of the victim's loss would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process."  18 U.S.C. § 3663A(c)(3)(A) and (B).

The government sought restitution in this case in connection with the defendants' convictions for conspiracy to defraud the Internal Revenue Service ("IRS") by attempting to interfere with its collection of income tax.[10]  According to the Eleventh Circuit, "a restitution order may order payment of losses consistent with the common law of conspiracy.  Namely, for restitution purposes, a defendant convicted of participation in a conspiracy is liable not only for [his] own acts, but also those reasonably foreseeable acts of others committed in furtherance of the conspiracy."  *Thomas*, 271 Fed. Appx. at 820 (quoting *U.S. v. Odom*, 252 F.3d 1289, 1299 (11th Cir. 2001)).  As a result, the court must order restitution to all victims for losses they sustained as a result of the defendants' conduct during the course of the conspiracy, as long as the losses resulted directly from the defendants' conduct and were closely related to the conspiracy.  *See, e.g., United States v. Valladares*, 544 F.3d 1257, 1269 (11th Cir. 2008); *United States v. Dickerson*, 370 F.3d 1330, 1339-43 (11th Cir. 2004).  In this case, the government proved at trial that the defendants conspired to  fraudulently market and sell products and services designed to interfere with the IRS' assessment and collection of income tax under the false premise that the government could not legally require individuals to pay taxes because the income

---

[9]  The government may be a victim for purposes of the MVRA.  *See, e.g., United States v. Senty-Haugen*, 449 F.3d 862, 865 (8th Cir. 2006); *U.S. v. Christensen*, 168 F. 3d 502, 1999 WL 47391, at * (9th Cir. Jan. 4, 1999) (unpublished opinion); *United States v. Minneman*, 143 F.3d 274, 284 (7th Cir. 1998).

[10]  While the MVRA does not authorize restitution for tax offenses, it explicitly authorizes restitution for violations of Title 18.  *See* 18 U.S.C. § 3663A(c)(1).

tax is unconstitutional.[11] The government also proved that the defendants did not file income tax returns during at least some of the years encompassing the conspiracy.[12] Although the defendants' own failure to pay income tax was not an object of the conspiracy, these actions unquestionably were closely related to the conspiracy. Indeed, according to the proof at trial, the defendants' failure to pay income tax furthered the conspiracy because it showed them to be "products of the product" and thus immune from the payment of income tax, which is precisely how they marketed the products.[13] As a result, both the government and the individuals to whom the defendants sold their products and services were victims of the defendants' conspiracy – the individual victims lost the money they spent in connection with their purchase of the defendants' fraudulent products and services and the government lost tax revenue as a result of the defendants' failure to pay income tax.

Rather than seek restitution on behalf of all of the victims, however, the government sought restitution only for its own loss of tax revenue. According to the government, restitution to the individual victims was impracticable and too complex in this case because it was impossible to determine how many, among PQI's estimated 11,000 customers, were actual victims of the defendants' fraud.[14] The government advised the probation officer of its position in that regard, and the probation officer so informed the court.[15] Because the court did not have sufficient information from which to prepare a restitution order at the

---

[11] The PQI materials contained numerous false promotional statements; however, the unconstitutionality of the 16th Amendment to the United States Constitution and thus the government's lack of authority to tax citizens was the overriding theme of PQI's sales pitch.

[12] There was no evidence, however, that the defendants assisted one another in evading the payment of income tax.

[13] This marketing strategy was highly effective in this case.

[14] The government's estimate of the number of victims is based on the total number of PQI's customers.

[15] According to the Pre-sentence Investigation Reports, the government acknowledged that both the IRS and PQI's 11,000 customers were victims of the defendants' fraud but advised the probation office that it could not determine the harm to the individual victims.

time the defendants were sentenced, the court postponed its decision on restitution and scheduled a hearing for 90 days after the first defendant was sentenced.[16] Although the court scheduled the hearing to allow the government an opportunity to present evidence in support of its restitution claim, the government appeared at the hearing unprepared to offer any evidence and instead argued that its actual loss was not capable of determination and that restitution to the individual victims was impracticable in this case. For the reasons set forth below, the court disagrees on both accounts.

A.    Government as a Victim

As noted above, the government limited its claim for restitution to the defendants' failure to pay tax on income generated as result of the defendants' conspiracy to defraud the IRS. Specifically, according to its sentencing memorandum, the government sought restitution from the defendants, jointly and severally, in the amount of 20% of the gross receipts all defendants earned in their capacities as PQI leaders, marketers, and/or vendors, or, in the event the court declined to impose joint and several liability, restitution from each defendant in the amount of 20% of that defendant's gross receipts. However, because the defendants' failure to pay income tax was not an element of the conspiracy charged in Count One, no findings were made at trial as to the government's loss of tax revenue.[17] In order to award restitution, therefore, the court had to make a finding at sentencing as to the government's actual revenue loss, which required a predicate finding of the defendants' tax liability. Rather than present evidence of the defendants' tax liability at the restitution hearing, however, the government relied on evidence of the defendants' alleged gross receipts, as introduced at trial, and argued that to arrive at the proper amount

---

[16] The defendants objected to the restitution calculations set forth in the Pre-sentence Reports. The government, therefore, was required to present evidence of its loss. *See, e.g., United States v. Searing*, 250 F.3d 665, (8th Cir. 2001) (noting the general rule that "evidence is required when the PSR's restitution calculations are objected to").

[17] In fact, the government argued strenuously at trial that it was not required to prove a tax loss in order to obtain a conviction on Count One. After hearing extensive argument on the issue from all parties, the court agreed and the government offered no such proof. Interestingly, although the government was required to, and did prove a tax loss in connection with the tax evasion charge against the Hirmers' in Count Three, the government did not seek restitution for that loss at sentencing.

of restitution, the court needed only to determine the amount of income tax the defendants should have paid on those gross receipts.[18]  Arguing that it was unable to determine the defendants' legitimate business expenses due to the sparseness of the defendants' financial records, the government urged the court to apply the 20% figure found in § 2T1.1(c)(2)(A) of the United States Sentencing Guidelines to the defendants' gross receipts to arrive at what it characterized as a conservative estimate of the amount of income tax the defendants owed.[19]  The government maintained that § 2T1.1(c)(2)(A) provided the best method for estimating its tax loss for restitution purposes, allowing leeway for the business deductions it could not ascertain.  The court could not disagree more.

As an initial matter, the court notes that the government failed to demonstrate that it was impossible, or, for that matter, even too burdensome, to determine its actual loss. *See Futrell*, 209 F.3d at 1291-92 (explaining that in order to estimate a victim's loss for

---

[18] At trial, the government introduced charts depicting the defendants' alleged gross receipts from the conspiracy.  The charts were prepared by IRS Agent Robert Combs, who testified that he had been instructed to determine the defendants' gross receipts and that, in doing so, he analyzed deposits into various bank accounts belonging to the defendants and/or organizations with which the defendants were associated, considering the likely sources of the deposits and making certain adjustments.  Based on his analysis, Agent Combs prepared annual summaries of the defendants' alleged gross receipts, which were reflected in the charts introduced at trial.  It should be noted that, in the case of the Hirmers, the government attributed to both Claudia and Mark Hirmer all of PQI's alleged gross receipts, some of which were derived from accounts registered in the name of another organization.  The government did not offer any evidence of Claudia Hirmer's or Mark Hirmer's ownership interest in PQI or any of the other organizations from which PQI's alleged gross receipts were derived.  In the case of SORCE, the government based the alleged gross receipts on a profit and loss statement in addition to bank statements.  Although the profit and loss statement set forth SORCE's net profit, Agent Combs considered only its gross income.  Moreover, as with PQI, the government attributed all of SORCE's alleged gross receipts to both Casternovia and Lyon and offered no evidence of their ownership interests in the organization or the manner in which the organization's proceeds were distributed.  Perhaps the government did not appreciate the need to prove each individual defendant's income from the conspiracy in light of its request for joint and several liability; but even if the court had awarded restitution in this matter, it would not have held the defendants jointly and severally liable because the government's request for restitution was based on the defendants' failure to pay income tax and there was no evidence at trial that the defendants conspired or even assisted one another in that regard.

[19] According to the government, in the section pertaining to tax crimes, the Sentencing Guidelines provide presumptive percentages a district court may use in calculating a tax loss for purposes of the offense level at sentencing when a more accurate determination cannot be made.  Pertinent to this case, § 2T1.1(c)(2)(A) provides that, "[i]f the offense involved failure to file a tax return, the tax loss shall be treated as equal to 20% of the gross income . . . less any tax withheld or otherwise paid, unless a more accurate determination of the tax loss can be made."  U.S.S.G. § 2T1.1(c)(2)(A).

purposes of restitution, the court not only must have a reasonable basis upon which to approximate the loss, but it also must find that it would be impossible to determine the victim's actual loss.). Indeed, the government offered no evidence – in the form of testimony from an IRS agent or otherwise – that it could not determine the defendants' tax liability from the defendants' financial records, all of which admittedly were in its possession.[20]  The government also failed to account for numerous facts relevant to the defendants' tax liability, including that the IRS audited some of the defendants and even prepared a tax assessment against the Hirmers;[21] Defendant Lyon filed delinquent tax returns and entered into an agreement with the government pursuant to which he satisfied his outstanding tax liability to the government; Merino filed delinquent tax returns setting forth the amounts he owed; and McPhillips entered into an agreement with the government as to the amounts he owed.[22]  It appeared to the court that, rather than work with the IRS

---

[20] It should be noted that the government was able to determine through an assessment the income tax due and owing from Claudia and Mark Hirmer despite the fact that, according to the evidence at trial, the Hirmers refused to even communicate with the IRS regarding their tax liability and kept poor financial records. Also, although the government claimed it was unable to determine the defendants' legitimate business deductions from the defendants' financial records, the government purportedly was able to calculate the defendants' gross receipts from the defendants' records and offered no explanation for its suggested inability to determine expenses.

[21] Only after the court questioned the government regarding its efforts to determine the defendants' actual tax liability did the government acknowledge that the IRS had audited some of the defendants. Counsel for the government indicated, however, that the audits encompassed only a portion of the tax years in question.  Although the court asked additional questions regarding the audits, including their status and outcome, it appeared that the government's counsel was largely unfamiliar with the civil audits and had made little effort to work with the IRS in determining the defendants' actual tax liability.

[22]  The court asked the government to explain the reasons its agreements with Lyons and McPhillips were not adequate to compensate the government for its actual losses as a result of the conduct of those defendants.  The government responded that, although McPhillips had filed delinquent tax returns, the tax returns had not been audited or reviewed by the government's counsel and may not be accurate.  The government, however, admittedly made no effort to determine whether any of the defendants' delinquent tax returns accurately reflected the amount of taxes they owed, much less present that information to the court. And the government never provided any support for the argument that it is entitled to restitution from defendants who have already satisfied their tax obligations.  In fact, the MVRA seemingly precludes such a result, providing that "[a]ny amount paid to a victim under an order of restitution shall be reduced by any amount later recovered as compensatory damages for the same loss by the victim" in any state or federal civil proceeding.  18 U.S.C. § 3664(j)(1)(2)(A) and (B); *see also U.S. v. Jenkins*, 884 F.2d 433, 440 (9th Cir. 1989) (noting that a court may order restitution up to the amount of a tax loss "*unless* [the defendants] have paid all or part of the tax liability . . . ") (emphasis in original).

to determine its actual tax loss as a result of the defendants' failure to pay income tax or, alternatively, establish on the record at the restitution hearing that such a determination could not be made and the reasons it could not be made, government's counsel concluded that such an effort was unnecessary and assumed the court would simply accept counsel's argument that the 20% of gross receipts figure was an acceptable measure of restitution. Contrary to the government's expectations, the court will not – and, indeed, cannot – award restitution under these circumstances.

Although the court may estimate a victim's loss for purposes of restitution, it may do so only when it has a reasonable basis upon which to approximate the loss. *See Futrell*, 209 F.3d at 1291-92.[23]  In arguing that application of the 20% figure found in §2T1.1(c)(2)(A) to the defendants' gross receipts results in a reasonable approximation of the government's tax loss in this case, the government wholly ignored the fact that, according to § 2T1.1(c)(2)(A), the 20% figure is to be applied to *gross income*, not gross receipts. *See* U.S. Sentencing Guidelines Manual § 2T1.1(c)(2)(A) (2007);[24]*see also United States v. Harris*, 200 Fed. Appx. 472 (6th Cir. 2006).  The *Harris* decision is highly instructive here.  In *Harris*, the defendant was convicted of conspiracy to defraud the IRS and tax evasion in connection with his failure to file income tax returns and pay federal income tax. In attempting to establish the defendant's base offense level under the Sentencing Guidelines, the government requested that the court apply the 20% figure in § 2T1.1(c)(2)(A) to the defendant's gross receipts to determine its tax loss, arguing that the

---

[23] In *Futrell*, the Eleventh Circuit determined that the district court did not abuse its discretion by accepting the government's approximation of the loss sustained by the Office of Workers' Compensation Programs ("OWCP") for purposes of restitution; however, the court based its decision on the fact that it was impossible to determine the precise amount of restitution due to an absence of records reflecting the defendant's actual earned income, as opposed to the amounts reported by the defendant, and the extent of the defendant's ability to work during the time he received federal disability benefits.  Notably distinguishable from this case, the court in *Futrell* relied on the testimony of an OWCP representative regarding his estimation of the government's loss, which provided the court with a basis upon which to reasonably approximate it.

[24] At the hearing, the court asked the government's attorneys whether they were aware of other instances in which a court had applied the 20% figure to a defendant's gross receipts to determine a tax loss for restitution purposes, and not one of them could recall such an occasion.  This is not surprising given the plain language of § 2T1.1(c)(2)(A).

20% figure accounted for the defendant's business expenses.  The court rejected the government's position as "untenable," noting the distinction between gross receipts and gross income, and explaining that "[w]hen a provision directs the court to use twenty percent of gross *income*, by definition the twenty percent has *not* already 'taken into consideration' the taxpayer's expenses.  Only by subtracting expenses from gross receipts can the court arrive at gross income – and it is a percentage of that latter number that must be used in the § 2T1.1 calculation."[25,26]  *Id.* at 495-96 (emphases in original). The government makes precisely the same argument here; however, the reason for rejecting the argument is even stronger in this case where the issue is not the base offense level but rather restitution, as a court's decision with regard to a loss calculation under the Sentencing Guidelines is much less demanding in terms of precision than a decision on restitution.  *See United States v. Huff*, 609 F.3d 1240, 1247-48 (11th Cir. 2010) (noting that "the amount of loss (for purposes of offense level calculation) is *either* the actual or intended loss while the restitution amount must be the actual loss suffered by the victim").

Following the Sixth Circuit's analysis in *Harris*, the court in this case rejected the government's argument for application of the 20% figure in § 2T1.1(c)(2)(A) to the defendants' gross receipts for purposes of restitution.  Further, because there was no evidence that the amount the government sought was a reasonable estimate, and not in excess, of its actual loss, the court denied the government's request for restitution.[27]  *See United States v. Beydoun*, 469 F.3d 102, 108 (5th Cir. 2006) (remanding case for a determination of actual loss based on net, rather than gross, profit); *United States v. Dove*, 585 F. Supp. 2d 865, 869 (W.D. Va. 2008) (noting that "[t]he proper measurement of loss,"

---

[25] The court also noted that the government provided no support for its tax-loss arguments. *See id.* at 495.

[26] Because the district court had not determined the portion of gross receipts that represented gross income, the court vacated the defendant's sentence and remanded the case for re-sentencing with a calculation of tax loss based on a percentage of gross income.

[27] Not only did the government offer no evidence that the amount it sought was a reasonable estimate of its actual loss, but it failed to prove that it suffered any loss at all.  The government also failed to acknowledge that its loss must be calculated according to the applicable tax laws. *See, e.g., United States v. Tucker*, 217 F.3d 960, 963 (8th Cir. 2000).

for purposes of restitution, "is lost net profit, not lost gross income" and denying restitution because the government failed to prove the amount of the victims' actual loss or establish a logical basis upon which to estimate it); *see also United States v. Huff*, 609 F.3d 1240, 1249 (11th Cir. 2010) (quoting *United States v. Arutunoff*, 1 F.3d 1112, 1121 (10th Cir. 1993)) (holding that "[r]estitution is not intended to 'provide a windfall for crime victims but rather to ensure that victims, to the greatest extent possible, are made whole for their losses.'"); *Jenkins*, 884 F.2d at 440 (holding that "the United States government should not be permitted to collect more than its total tax loss as 'restitution'").

B.      Customers as Victims

Even if the government had proved its actual loss or given the court a proper basis upon which to reasonably estimate it, the court could not award the government restitution in this matter because the government neither sought restitution on behalf of the individual victims nor sufficiently demonstrated an inability to do so.   Both in a footnote in its restitution memorandum and at the hearing, the government argued that it was not required to seek restitution on behalf of the individual victims in this case because at least some of PQI's customers purchased PQI memberships and products in an effort to avoid paying income tax and thus had a criminal mindset and were not entitled to restitution.[28] According to the government, based on the number of PQI customers and the difficulty in assessing their relative culpability or intent in purchasing the PQI memberships, it was impossible to ascertain which PQI customers were true victims in the case.[29]

Regarding the number of PQI customers, the court was not persuaded by the government's argument that it was impracticable to contact the customers to determine whether someone was a victim.   When pressed as to its efforts to identify the individual

---

[28] Oddly, for guideline purposes at sentencing, the government sought an offense conduct upward adjustment for each defendant based on the number of PQI customer victims in the case, which it argued was 11,000, and in doing so, made no such distinction between PQI's customers.

[29] In support of its argument, the government relied on the fact that, under the MVRA, restitution is not required when "the number of identifiable victims is so large as to make restitution impracticable" or when "determining complex issues of fact related to the cause or amount of the victim's loss would complicate or prolong the sentencing process to a degree that the need to provide restitution is outweighed by the burden on the sentencing process."  18 U.S.C. § 3663A(c)(3)(A) and (B).

victims, the government conceded that it made minimal effort to do so despite the fact that it had a spreadsheet containing the names and addresses of all of PQI's customers and a statutory obligation to do so, albeit to the extent practicable. Because the government had the names and addresses of all 11,000 customers, at a minimum it could have contacted them in writing, explaining that it was investigating the matter, informing them that they might be victims entitled to restitution, and requesting that they contact the government regarding their purchases of products and services from the defendants. Although that act alone might not have revealed all of the true victims in this case, it at least would have been a starting point and would have better enabled the court to determine whether identifying all of the individual victims was impracticable. The government nevertheless unilaterally decided to forego that or any other meaningful effort to identify non-government victims; it also elected not to present the court with evidence substantiating its claim that the number of identifiable victims was so large as to make restitution impracticable.[30]  *See United States v. Catoggio*, 326 F.3d 323, 328 (2d Cir. 2003) (rejecting the defendant's argument that approximately 10,000 victims were unidentifiable and restitution was impracticable when the government was in possession of documents identifying the victims and their respective losses).

The court also was unpersuaded by the government's suggestion that it was too complex a task to identify the individual victims based on the difficulty in assessing the relative culpability or intent of the customers in purchasing the PQI memberships. The question of whether PQI's customers were victims entitled to restitution was a decision for the court, not the government, to make. *See* 18 U.S.C. §§ 3663A and 3664; *see also Catoggio*, 326 F.3d at 328 (noting that the court, not the government, makes the determination as to whether restitution would be unduly burdensome). The government afforded the court no opportunity to make that determination or even to decide whether

---

[30] The government has been investigating this matter since 2004. The defendants were indicted on August 21, 2008. According to government counsel, the government nevertheless interviewed only 20 to 25 of the 11,000 customers.

such a determination was possible.[31]  The government offered no proof - either at trial or at the restitution hearing - that the customers who purchased PQI memberships and products did so with the intent to defraud the IRS.[32]  A belief that one is not obligated to pay taxes or a desire to avoid paying taxes is not criminal.  *See, e.g., U.S. v. Innes*, 270 Fed. Appx. 899, 902 n.3 (11th Cir. 2008) ("A defendant who believes in good faith that he has no duty to pay taxes lacks the requisite criminal intent for tax evasion, no matter how unreasonable the belief . . . .").  There is also no proof in the record that the customers were unindicted co-conspirators.  The gravamen of this case was the defendants' fraudulent and misleading marketing activities, through which the defendants falsely advised customers that they had conclusive proof of the unconstitutionality of the 16th Amendment and a stable of "attorneys at law and tax experts" who would show them the way to legally immunize themselves from tax liability and completely eliminate their debt (without satisfying that debt).  Purchasing products offering advice on debt-elimination and tax-evasion strategies in of itself, particularly in a case such as this where the defendants fraudulently marketed their products as providing lawful means to escape income tax liability, does not make one complicit in a conspiracy to defraud the IRS.[33]  Accordingly, because the government neither sought restitution on behalf of the individual victims nor demonstrated the impracticability of doing so, the court denied the government's request for restitution.  *See id.* at 327-28 (vacating restitution order and remanding the case for re-sentencing on restitution because the court should have identified the victims and their actual losses before ordering restitution and erred in ordering restitution in an amount not representative of the victims' actual losses). An award of restitution solely to the government in this case would have improperly allowed the government alone to decide

---

[31] The government never even identified the individual victims to probation.

[32] To the contrary, the government portrayed the customers at trial as innocent victims who were misled by the defendants' fraudulent marketing efforts.

[33] Even assuming a "guilty mindset" on the part of the customers, the government failed to cite any persuasive authority that they would be precluded from receiving restitution.  Although the government cited *United States v. Koonce*, 991 F.2d 693 (11th Cir. 1963) in support of its argument, Koonce did not decide this issue.

Case No: 3:08cr79/MCR

whether the non-government victims should have received restitution, thus, effectively eviscerating the requirement that the court "ensure that all other victims receive full restitution before the United States receives any restitution." 18 U.S.C. 3664(I). The court declined to reach a result so clearly contrary to the MVRA.

**CONCLUSION**

The government's claim for restitution was, and is, hereby DENIED.

**DONE and ORDERED** this 8th day of February, 2011.


s/ *M. Casey Rodgers*

**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**